## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| BONNIE M. WILSON, | : | Case No. 3:16-cv-81 |
| | : | |
| Plaintiff, | : | District Judge Thomas M. Rose |
| | : | Chief Magistrate Judge Sharon L. Ovington |
| vs. | : | |
| | : | |
| CAROLYN W. COLVIN, | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATIONS[1]

### I.    Introduction

Plaintiff Bonnie M. Wilson applied for a period of disability, Disability Insurance Benefits, and Supplemental Security Income on July 12, 2013.  She asserted that she could no longer work a substantial paid job due to degenerative disc disease, fibromyalgia, obesity, irritable bowel syndrome (IBS), and anxiety disorder.  Her applications, medical records, and other evidence proceeded to a hearing before Administrative Law Judge (ALJ) Theodore W. Grippo who later issued a written decision.  The result of his decision was the denial of her applications based on his central conclusion that she was not under a "disability" as defined in the Social Security Act.  Plaintiff brings the present case challenging ALJ Grippo's non-disability decision.

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #10), Plaintiff's Reply (Doc. #11), the administrative record (Doc. #6), and the record as a whole.

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings.  The Commissioner asks the Court to affirm ALJ Grippo's non-disability decision.

## II.    Background

Plaintiff asserts that she has been under a disability since March 1, 2009.  She was fifty years old at the time she filed her applications and was therefore considered a person "closely approaching advanced age" under Social Security Regulations.  *See* 20 C.F.R. § 404.1563(d).  She has at least a high school education.

### A.    Plaintiff's Testimony

Plaintiff testified at the hearing before ALJ Grippo that she is unable to work because it is "too painful."  *Id.* at 70.  She has both fibromyalgia and lower chronic back pain.  *Id.*  Her back pain limits her ability to stand and walk.  *Id.*  After walking three blocks to the hearing, her hips and shins began to burn, and her back hurt.  *Id.*  She was "a little bit" comfortable sitting in the chair at the hearing, but she said that eventually she has to stand up.  *Id.* at 71.  She is most comfortable when she is lying down.  *Id.*  Bending over is very painful, and she tries not to lift things.  *Id.* at 71-72.  She can lift a gallon of milk or a twelve pack of pop but cannot lift a twenty-four pack.  *Id.* at 72.  She currently takes Methadone and Percocet for pain.  *Id.*  She is prescribed Methadone as a substitute for OxyContin because her insurance will not pay for OxyContin.  *Id.* at 73.

2

Plaintiff's fibromyalgia affects her arms and legs. *Id.* For example, she is unable to "vacuum in [a] continuous motion" because "the same motion for a long time" causes her more pain. *Id.* Additionally, it causes the muscles in her calves and forearms to "grip up," and "it feels like you're having a Charley horse constantly." *Id.* at 73-74. She is able to take a small bag of garbage to the dumpster and clean dishes for approximately ten minutes at a time. *Id.* at 74. If she had thirty-minutes worth of dishes to clean, she would have to wash half of them, take a break to sit down, and then finish. *Id.*

Her pain stops her from being active and playing sports. *Id.* at 78. For example, she cannot bowl or mow a yard. *Id.* She also gets distracted and frustrated more easily, and "it's brought down the quality of [her] life tremendously." *Id.* Generally, she can only sit or stand for thirty minutes before having to take a break to lie down. *Id.* at 79.

Plaintiff's IBS also interferes with her ability to work. *Id.* at 77. She has medication that stops her cramping and is supposed to stop diarrhea as well. *Id.* However, she never knows how many doses she will have to take or how long each episode will last. *Id.* She generally experiences these episodes two to three times per month. *Id.*

Plaintiff also struggles with depression and anxiety. *Id.* at 75. She tends to shy away from groups of people, and attending new things makes her shake and sick to her stomach. *Id.* Her mental health problems have "stayed about the same" since 2001, and they do not "get in the way" when she is working. *Id.* at 76.

When asked by the ALJ if she has a problem with drugs, Plaintiff responded that she does not. *Id.* at 84. He noted that "[t]here were some indications in [her] file that

3

[she does]." *Id.* She accidentally overdosed in November 2013. *Id.* at 84-85. The ALJ asked if she gave seventy pills away to a friend, tried to fill her Methadone prescription early, or told her doctor that her Percocet was flushed down the toilet. *Id.* at 85. She responded that she did not remember. *Id.* In addition, she does not remember becoming hostile, cursing, and throwing things in the emergency room because they would not give her narcotics, but her mom and roommate told her she did. *Id.* at 86. Additionally, between 2003 and 2008, "I had a problem with people, I've let them stay with me and then I'd wake up and my medication would be gone." *Id.* at 85. She told her doctor about the theft and also reported that her medication was stolen out of her glovebox in 2013. *Id.* at 85-86.

Plaintiff last worked as a cashier at Dollar General. *Id.* at 68. After working for approximately eighteen months, she was let go on March 3, 2009 because of her attendance. *Id.* She called off worked once or twice per month due to IBS. *Id.* In 2007, she worked as a cab driver for railroad employees. *Id.* at 81. She was let go due to her attendance problem. *Id.* at 81-82. Before that, she worked as a pharmacy technician for five years. *Id.* at 69. She was let go on December 15, 2005 for attendance problems. *Id.*

Plaintiff lives in a friend's apartment. *Id.* at 82. She does not have to pay rent. *Id.* at 83. Her mother helps her pay the cable bill and other things. *Id.* She has a driver's license but not a car. *Id.* She drives her friend's car. *Id.* at 83-84. She had two children, but one passed away six years before the ALJ's hearing. *Id.* at 82.

### B. Vocational Expert's Testimony

The ALJ posed the following hypothetical to Denise Waddell, a vocational expert:

> [P]lease assume a hypothetical individual of the same age, education, and vocational background as those of the claimant, and assume that such an individual is capable of performing light work with the following limitations. She can never climb ladders, ropes, or scaffolds. And she would be limited to frequent stooping, kneeling, crouching, and crawling. … The individual would be limited to work that is simple, routine, and repetitive; with no requirement for extended concentration or attention; with no fast pace or production quotas; with only occasional superficial interaction with coworkers and supervisors and none with the general public; and with changes that are infrequent and easily explained. … [W]ould such an individual be able to do any of the past work of the claimant?

*Id.* at 87. Ms. Waddell responded that this hypothetical person could not perform Plaintiff's past work. *Id.* However, there is other work that "such an individual" can perform that exists in significant numbers in the regional or national economy. *Id.* at 87-88. For example, there are, according to Ms. Waddell, 1,350 positions as a folding machine operator in Ohio (46,300 nationally); 960 as a collator operator in Ohio (36,300 nationally); and 1,200 as a retail price marker in Ohio (92,400 nationally). *Id.* at 88.

Plaintiff's attorney also posed several questions to Ms. Waddell. She testified that there are no positions above sedentary for a person who can only stand and walk for two hours and sit for six hours in a workday. *Id.* Further, Plaintiff does not have any job skills that would transfer to sedentary jobs. *Id.* Generally, employers tolerate one day of absence per month. *Id.* at 89. Finally, her attorney asked, "Is what [Plaintiff] described as far as [] holding a job for maybe a year or so, but then consistent absenteeism coming up and then being released, is that consistent with the way that kind of thing works as far as being released due to absenteeism at unskilled light or sedentary jobs?" *Id.* She responded that it was. *Id.*

5

### C.     Medical Opinions

#### i.  Damian M. Danopulos, M.D.

Dr. Danopulos examined Plaintiff on August 19, 2011.  *Id.* at 363.  Plaintiff

reported that she always feels pain in her shoulders, hips, and knees.  *Id.*  He noted that

her shoulders, hips, and knees revealed painful motions, and her left shoulder, hips, and

knees showed slightly restricted motions.  *Id.* at 365.  In addition, she told Dr. Danopulos

that she "experiences constant and continuous low back pain, which on a scale between

[one and ten] is always a six, but may intensify on occasion."  *Id.* at 364.  He noted that

her mid-dorsal to lumbosacral spine was painful pressure.  *Id.* at 366.  Her lumbar-spine

motions were restricted and painful, and squatting and rising from squatting triggered

lumbar-spine pain.  *Id.*

His "objective findings were:  1) Rule out left should early arthritic changes, 2)

Bilateral hip arthralgias, 3) Bilateral knee arthralgias, 4) Rule out mild degree

lumbosacral spine arthritic changes, 5) History of IBS not affecting her body weight, 6)

Exogenous versus morbid obesity (mostly morbid obesity), and 7) Depression."  *Id.* at

367.  He concluded, "[h]er ability to do any work-related activities is affected from her

rule out left shoulder and lumbar spine arthritic changes.  Her IBS and overweight are

additional problems."  *Id.*

#### ii.  Jerry E. Flexman, Ph.D.

On September 7, 2011, psychologist Dr. Flexman evaluated Plaintiff.  *Id.* at 374.

He noted that she was able to take care of all her activities of daily living on her own.  *Id.*

at 375.  More specifically, she dusts, sweeps, cleans, cleans dishes, and does laundry.  *Id.*

She goes to the store twice per week, enjoys going out to eat and to the library, and visits and talks to her friends and family.  *Id.*  Her physical characteristics were within normal limits, but her posture was tense and he observed a gait disturbance with limping.  *Id.* at 376.  "Signs of anxiety were not noted."  *Id.*  She reported excessive worry and concerns about fibromyalgia and multiple physical complaints.  *Id.* at 377.

Dr. Flexman noted that she was able to accurately follow instructions during the exam, and her intellectual level of functioning was "minimally within the average range."  *Id.* at 379.  She maintained focus and attention during the sixty to ninety minute interview; she did not appear to be distracted by other environmental sounds; and her work history indicated she was able to maintain focus and attention at previous jobs.  *Id.*  He opined that she "may not have problems in relation to others in the workplace."  *Id.*  Further, "[w]ork pressures would not be expected to significantly increase psychological problems."  *Id.*  Dr. Flexman diagnosed her with depression, not otherwise specified, and assigned a current Global Assessment of Functioning (GAF) score of sixty-five.  *Id.* at 378.

### iii.  Donald J. Kramer, Ph.D.

Dr. Kramer evaluated Plaintiff on August 27, 2013.  *Id.* at 410.  She reported that her main work limitations are fibromyalgia, chronic back pain, and IBS.  *Id.*  However, she also has mood swings, anxiety, and panic attacks.  *Id.* at 410-11.  She has been anxious since she was a child, but her emotional problems became much worse when her son passed away in 2008.  *Id.* at 411.  She reported that she has lost many jobs because of attendance issues.  *Id.*  Although she primarily called off work for her physical problems,

she also occasionally called off because of anxiety and panic attacks. *Id.* Her daily activities include watching television and taking a short walk "so she does not stiffen up due to her fibromyalgia." *Id.* at 412. She also visits her son and grandson, reads, and spends time with the friend she lives with. *Id.* She cannot do laundry or cook because of her physical limitations, and she does not like to leave the house and go places because of her social anxiety, panic attacks, and physical limitations. *Id.*

Dr. Kramer noted that "[h]er affect was quite anxious. She was fidgety and restless and shook frequently…. She also comes across as being depressed and sad and was tearful off and on in [the] examination." *Id.* Additionally, Plaintiff "was spontaneous to the point of being somewhat overproductive and rapid and pressured in her speech. She frequently had to be slowed down and questions had to be re-asked of her and she had to be redirected." *Id.* He diagnosed her with panic disorder with agoraphobia, generalized anxiety disorder, and bipolar disorder, mixed. *Id.* at 413-14. He assigned her a symptom, functional, and overall GAF score of fifty-four. *Id.* at 414.

Dr. Kramer opined that she appears to have the intellectual ability to perform simple tasks, but her attention, concentration, persistence, and pace were "a little weak." *Id.* She reported that although her overall work performance has been adequate in the past, her anxiety has gotten worse since she was last employed. *Id.* at 414-15. He also noted that she was pleasant and cooperative in the interview, but she was also trembling, shaking, and very nervous. *Id.* at 415. She also reported being socially avoidant and anxious, and she has difficulty going to public places by herself. *Id.* Dr. Kramer opined that her "ego strength and coping skills appear to be rather weak." *Id.* Additionally,

8

"[o]verall, she displays a high level of emotional distress and although she believes that her main work limitations are physical in nature, she does come across as having limited coping skills…." *Id.*

### iv. Cynthia Waggoner, Psy.D., & Bonnie Katz, Ph.D.

Dr. Waggoner reviewed Plaintiff's records on September 6, 2013. *Id.* at 114-28. She opined that Plaintiff has four severe impairments: disorders of the back—discogenic and degenerative; fibromyalgia; anxiety disorders; and affective disorders. *Id.* at 121. She has a mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, and pace; and no repeated episodes of decompensation. *Id.* at 122. She is moderately limited in the ability to carry out detailed instructions; maintain attention and concentration for extended periods; and complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. *Id.* at 125. She is also moderately limited in the ability to interact appropriately with the general public and respond appropriately to changes in the work setting. *Id.* at 126.

Dr. Katz reviewed Plaintiff's records on December 21, 2013, and reached the same conclusions as Dr. Waggoner. *Id.* at 153-58. She added that Plaintiff was moderately limited in the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. *Id.* at 158.

### v. Gerald Klyop, M.D., & Edmond Gardner, M.D.

Dr. Klyop reviewed Plaintiff's records on September 6, 2013. *Id.* at 123-24. He opined that she could occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds. *Id.* at 123. She can stand and/or walk for six hours in an eight-hour day, and sit for six hours. *Id.* at 123-24. She can frequently stoop, kneel, crouch, and crawl but never climb ladders, ropes, or scaffolds. *Id.* at 124. He concluded that she was not disabled. *Id.* at 128. On December 31, 2013, Dr. Gardner reviewed her records, and reached the same conclusions as Dr. Klyop. *Id.* at 155-56, 160.

## III.   Standard of Review

The Social Security Administration provides Disability Insurance Benefits and Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 423(a)(1), 1382(a). The term "disability" – as defined by the Social Security Act – has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job – i.e., "substantial gainful activity," in Social Security lexicon. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec*., 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or

disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance…." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry – reviewing the correctness of the ALJ's legal criteria – may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## IV. <u>The ALJ's Decision</u>

As noted previously, it fell to ALJ Grippo to evaluate the evidence connected to Plaintiff's application for benefits. He did so by considering each of the five-sequential

11

steps set forth in the Social Security Regulations.  *See* 20 C.F.R. §§ 404.1520, 416.920.[2]

He reached the following main conclusions:

Step 1:     Plaintiff has not engaged in substantial gainful employment since March 1, 2009.

Step 2:     She has the severe impairments of degenerative disc disease, fibromyalgia, obesity, and anxiety disorder.

Step 3:     She does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4:     Her residual functional capacity, or the most she could do in a work setting despite her impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of "light work… except that the claimant can never climb ladders, ropes, and scaffolds and she is limited to frequent stooping, kneeling, crouching, and crawling. The claimant is limited to work that is simple, routine, and repetitive, with no requirement for extended concentration or attention, and with no fast pace or production quotas, with only occasional superficial interaction with co-workers and supervisors, and none with the general public, and with changes that are infrequent and easily explained."

Step 4:     She is unable to perform any of her past relevant work.

Step 5:     She could perform a significant number of jobs that exist in the national economy.

(Doc. #6, *PageID* #s 45-58).  These main findings led ALJ Grippo to ultimately conclude

that Plaintiff was not under a benefits-qualifying disability.  *Id.* at 58.

The ALJ also noted that Plaintiff previously applied for benefits, and on February

24, 2011, ALJ Howard K. Treblin found that she was not disabled.  *Id.* at 45.  ALJ

---

[2] The remaining citations will identify the pertinent Disability Insurance Benefits Regulations with full knowledge of the corresponding Supplemental Security Income Regulations.

Grippo did not adopt the previous residual functional capacity determination because the "updated records contain new and material evidence that requires different limitations, including that she has developed degenerative disc disease." *Id.; see Drummond v. Comm'r of Soc. Sec.,* 126 F.3d 837 (6th Cir. 1997); Acquiescence Rule 98-4(6), 1998 WL 283902 (Soc. Sec. Admin. June 1, 1998).

## V.    <u>Discussion</u>

Plaintiff contends that the ALJ's residual functional capacity (RFC) assessment is not based on substantial evidence because he mischaracterized Dr. Kramer's opinions and failed to account for all the limitations provided by the State agency psychologists.  She also argues that the ALJ failed to consider or properly evaluate several of her physical impairments.  The Commissioner maintains that substantial evidence supports both the ALJ's evaluation of the medical source opinions and his determination that Plaintiff could perform a limited range of light work activities.  The Commissioner also asserts that the ALJ properly evaluated her impairments.

### A.    State Psychologists' Opinions

The ALJ also gave the State agency record-reviewing psychologists' opinions great weight.  (Doc. #6, *PageID* #55).  He found that their opinions are "supported by the evaluation and the report of the mental consultative examiner, Dr. Kramer."  *Id.*  He also noted that they are "highly qualified… psychologists who are experts in the Social Security disability programs…."  *Id.*

Plaintiff asserts the ALJ omitted a significant portion of the state agency psychologists' opinions when constructing the RFC.  (Doc. #7, *PageID* #710).

13

Specifically, Dr. Katz opined that she "is capable of simple tasks not requiring her to sustain close consistent [attention and concentration] over an extended period, nor to meet fast-paced performance demands."[3] (Doc. #6, *PageID* #157). Plaintiff acknowledges that the ALJ's assessment of her RFC accounts for simple tasks with no requirements for extended concentration or attention. (Doc. #7, *PageID* #711). But she contends, "that completely ignores the need for a working environment that does not require close consistent attention and concentration. Nor does the ALJ explain why these limitations were not accepted." *Id.*

Plaintiff relies on the court's reasoning in *Benton v. Commissioner of Social Security*, "[T]here seem[s] to be two components to having moderate problems in concentration. One deals with the frequency of how often one cannot concentrate. The other deals with the level of sophistication or intensity of the work that can be done with the concentration limitation." 511 F.Supp.2d 842, 846 (E.D. Mich. 2007) (internal quotation marks omitted). The court found that the ALJ's hypothetical did not address the frequency of how often the person would be unable to concentrate, but it did address the sophistication or intensity of the work that can be done "by limiting Plaintiff to only simple, repetitive tasks." *Id.* at 846.

According to Plaintiff, "the ALJ may have accounted for the frequency by incorporating the restriction of no requirement for extended attention and concentration," but "he failed to describe the level of intensity by including the need to avoid work that

---

[3] Although Plaintiff refers to the State psychologists' opinions, in response to the same question, Dr. Waggoner only noted that she is limited to simple tasks." *Id.* at 125.

also required close and consistent attention." (Doc. #7, *PageID* #711). Plaintiff's reliance on *Benton* is misplaced. She attempts to divide "simple tasks not requiring her to sustain close consistent [attention/concentration] over an extended period" into two separate limitations: (1) "simple tasks with no requirements for extended concentration or attention;" and (2), "a working environment that does not require close consistent attention and concentration." *Id.* However, her interpretation is incorrect. Dr. Katz does not opine that Plaintiff cannot sustain *any* close consistent attention/concentration; she only indicates that she cannot do so over an extended period.

This is further supported by Dr. Katz and Dr. Waggoner's opinion that Plaintiff's ability to carry out very short and simple instructions is not significantly limited, but her abilities to carry out detailed instructions and maintain attention and concentration for extended periods are moderately limited. In addition, the ALJ specifically acknowledged, "Dr. Katz opined the claimant was capable of simple tasks not requiring her to sustain *close consistent* attention/concentration over an extended period." (Doc. #6, *PageID* #54) (emphasis added). The ALJ's assessment of Plaintiff's RFC accounts for these limitations. Specifically, it limits her to work that is simple, routine, and repetitive, with no requirement for extended concentration or attention, and no requirement for fast pace or production quotas.

### B. Additional Physical Impairments

Plaintiff asserts, "The ALJ either did not adequately explain the impact of the impairment on the residual functional capacity, did not properly evaluate the impairment as prescribed by Social Security Rules, or outright ignored a well-documented

impairment." (Doc. #7, *PageID* #712). Specifically, she contends that the ALJ ignored her IBS completely, only making one reference to it in his entire decision.[4] *Id.* at 715.

Plaintiff's medical records establish IBS as a medically determinable impairment. For example, Dr. Danopulos noted that she has suffered from IBS for the past five years. (Doc. #6, *PageID* #364). He also indicated that "[h]er IBS and weight are additional problems." *Id.* Additionally, her primary-care physician, Dr. Jewel Stevens, notes as early as March 2009 that she complained of stomach pain, and Dr. Stevens prescribed Lomotil, a medication used to treat diarrhea. *Id.* at 674; *see* U.S. Nat'l Library of Med., *Drugs, Herbs and Supplements – Diphenoxylate,* MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a601045.html (last revised Sept. 15, 2015). In November 2013, Dr. Stevens prescribed a refill of her IBS medication. (Doc. #6, *PageID* #670).

At step two, the ALJ considers the severity of the claimant's medically determinable impairments. 20 C.F.R. § 404.1520(a)(4)(ii). The ALJ must consider the severity of each impairment, separately, and in combination with the claimant's other impairments. Soc. Sec. Rul. No. 85-28, 1985 WL 56856, at *3 (Soc. Sec. Admin. 1985). "And to the extent an ALJ determines that an identified impairment, severe or *non-severe,* does not result in any work-related restrictions or limitations, the ALJ 'is required to state the basis for such conclusion.'" *Katona v. Comm'r of Soc. Sec.,* 2015 WL

---

[4] In addition to IBS, Plaintiff contends that the ALJ failed to properly consider her fibromyalgia and obesity.

871617, at *6 (E.D. Mich. Feb. 27, 2015) (quoting *Hicks v. Comm'r of Soc. Sec.,* 2013 WL 3778947, at *3 (E.D.Mich. July 18, 2013)) (other citations omitted).

In the present case, the ALJ did not mention Plaintiff's IBS at step two.  Thus, he did not determine whether it was severe or non-severe.  In addition, he did not find that it was not a medically determinable impairment.  Defendant asserts that, if anything, the ALJ's omission is harmless error.  "Since the ALJ found several impairments in this case, he proceeded through the remaining evaluation and accounted for the functional limitations supported by the record in his RFC analysis, making any 'error' at step two clearly inconsequential."  (Doc. #10, *PageID* #728) (citations omitted).

But Defendant is only partly correct.  Generally, an ALJ does not commit reversible error by finding a non-severe impairment as long as: (1) the ALJ also found that the claimant has at least one severe impairment; and (2) the ALJ considered both the severe and non-severe impairments at the remaining steps in the sequential evaluation. *See Maziarz v. Sec'y of Health and Human Servs.,* 837 F.2d 240, 244 (6th Cir. 1987); *see also Fisk v. Astrue,* 253 F.App'x 580, 583 (6th Cir. 2007); *Nejat v. Comm'r of Soc. Sec.,* 359 F.App'x 574, 577 (6th Cir. 2009); *Pompa v. Comm'r of Soc. Sec.,* 73 F.App'x 801, 803 (6th Cir. 2003) ("[O]nce the ALJ determines that a claimant has at least one severe impairment, the ALJ must consider all impairments, severe and non-severe, in the remaining steps.").

The present case varies in two significant ways from *Maziarz*, *Fisk*, *Nejat*, and *Pompa*. .  First, ALJ Grippo did not find that Plaintiff's IBS was non-severe; he did not consider it at all at step two.

17

Second, and more significantly, unlike the ALJs in *Maziarz*, *Fisk*, *Nejat*, and *Pompa*, ALJ Grippo did not consider Plaintiff's IBS at steps three or four and thus failed to consider all of Plaintiff's impairments, both severe and non-severe, as required at steps three or four. *See Pompa*, 73 F.App'x at 803.[5]  Indeed, the ALJ only refers to IBS once, noting "history of irritable bowel syndrome not affecting her body weight…" when summarizing Dr. Danopulos's objective findings.  (Doc. #6, *PageID* #52).  He did not discuss IBS when determining at step three if Plaintiff had an impairment or combination of impairments that meets or equals the Listings.  Similarly, at step four, there is no indication that he considered IBS when assessing her RFC.

The ALJ's lack of meaningful consideration of IBS at step four constitutes error under the Regulations.  "In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  Soc. Sec. Rul. No. 96-8P, 1996 WL 374184, at *5 (Soc. Sec. Admin. July 2, 1996).  The ALJ failed to address any limitations or restrictions caused by IBS.  For example, Plaintiff testified that she had to call off work once or twice a month because of IBS.  (Doc. #6, *PageID* #68).  She explained, "you get up, get a shower, get dressed, and ready to go out the door and it just hits you and you're in the bathroom for a half hour, 45 minutes because you can't get off the toilet."  *Id.* at 77.  This occurs at least two to three

---

[5] *See also* Carolyn A. Kubitschek & Jon C. Dubin, Social Security Disability Law & Procedure in Federal Court § 3:14 (2015 ed.) (citations omitted) ("[T]he step two determination of severity is merely a threshold requirement. Thus, there is no step two impairment inventory requirement.  So long as the limiting effects of the other impairments are considered at steps three, four, and five, the lack of inventory at step two (or a non-severe finding at step two) on those other impairments is usually a harmless error.").

times per month, and she never knows when it will occur and or how long it will last. *Id.*
She has medication to stop her cramping and diarrhea but sometimes has to take two or
three doses before it works. *Id.* Even Dr. Kramer notes that she has IBS, and she
reported "significant symptoms." *Id.* at 410.

In light of the vocational expert's testimony that an employer will only tolerate
one absence per month, Plaintiff's absences due to IBS are particularly relevant to her
ability to perform a job. But, the ALJ's assessment of her RFC is devoid of any
consideration of her IBS by itself or in combination with her other severe and non-severe
impairments. This constitutes error, and as a result, ALJ Grippo's assessment of
Plantiff's RFC is not supported by substantial evidence.

## C.    Remand[6]

A remand is appropriate when the ALJ's decision is unsupported by substantial
evidence or when the ALJ failed to follow the Administration's own regulations and that
shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial
right. *Bowen*, 478 F.3d at 746. Remand may be warranted when the ALJ failed to
provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson v.
Comm'r of Soc. Sec.*, 378 F.3d 541, 545-47 (6th Cir. 2004); failed to consider certain
evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to
consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-

---

[6] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of
Plaintiff's challenge to the ALJ's assessment of Dr. Kramer's opinions, fibromyalgia, and obesity is
unwarranted.

26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff to lack credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Humans Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and the evidence of disability is not strong while contrary evidence is lacking. However, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to sentence four of §405(g) due to the problems discussed above. On remand, the ALJ should be directed to evaluate the evidence of record under the applicable legal criteria mandated by the Commissioner's Regulations and Rulings and by case law; and to evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and whether her applications for Disability Insurance Benefits and Supplemental Security Income should be granted.

## IT IS THEREFORE RECOMMENDED THAT:

1.     The Commissioner's non-disability finding be vacated;

2.      No finding be made as to whether Plaintiff Bonnie M. Wilson was under a "disability" within the meaning of the Social Security Act;

3.      This matter be **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Report and Recommendations, and any decision adopting this Report and Recommendations; and

4.      The case be terminated on the Court's docket.

Date:  November 15, 2016                         *s/Sharon L. Ovington*
                                                 Sharon L. Ovington
                                                 Chief United States Magistrate Judge

21

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days if this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).